[Cite as *Honek v. Chidsey*, 2021-Ohio-3816.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

NORMAN G. HONEK, ET AL.,              :

     Plaintiffs-Appellees,              :      Nos. 109478, 109485, and 109486

     v.              :

DONNA E. CHIDSEY, ET AL.,              :

     Defendants-Appellants.              :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** October 28, 2021

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CV-17-878598, CV-17-879674, and CV-17-882477

---

### *Appearances:*

Merriman, Legando, Williams & Klang, L.L.C., and Tom C. Merriman; Grieco Law, L.L.C., and Paul Grieco, *for appellees* Norman Honek, Dora LoPiccolo, and Robert McDonald, etc.

Nurenberg, Paris, Heller & McCarthy Co., L.P.A., Brenda M. Johnson, Jamie R. Lebovitz, and Jeffrey M. Heller, *for appellee* Joseph Gielas, as Administrator of the Estate of Nancy Gielas, deceased.

Michael L. Morgan, *for appellant* City of Parma Heights.

KATHLEEN ANN KEOUGH, P.J.:

**{¶ 1}** Defendant-appellant, city of Parma Heights ("the city") appeals the denial of its motion for summary judgment based on recreational and/or political

subdivision immunity against plaintiffs-appellees, the Estate of Nancy Gielas ("Gielas"), Norman Honek ("Honek"), Dora LoPiccolo ("LoPiccolo"), and the Estate of Kathleen McDonald ("McDonald") (collectively "appellees").[1] For the reasons that follow, we reverse the trial court's decision and remand for the trial court to enter judgment in favor of the city on the basis of political subdivision immunity.

## I. Procedural and Factual History

**{¶ 2}** On August 21, 2016, the city hosted the final concert in its annual Summer Band Concert series at Greenbriar Commons. The concert featured a Dean Martin/Frank Sinatra tribute band, who performed in the gazebo, which is located in the front corner of Greenbriar Commons off of Pearl Road in Parma Heights. The gazebo sits on the grassy area between a parking lot and the library. Attendees of the concert could sit in the grassy area around the gazebo to listen to the music and watch the band's performance. Additionally, attendees could dance on the portable, temporary dance floor that the city constructed and placed in the parking lot directly adjacent to the grassy seating area. The city placed removable wooden sawhorses around the dance floor as a barrier. The parking lot area was not otherwise entirely closed off, but it was open for the public, including the concert attendees, to park their vehicles.

**{¶ 3}** During the concert, Donna E. Chidsey ("Chidsey") voluntarily parked her vehicle directly next to the sawhorses used to cordon off the dance floor. A

---

[1] During the pendency of the appeal, appellees Honek and LoPiccolo settled their case with the city. Accordingly, this appeal pertains only to appellees Gielas and McDonald.

photograph produced during the deposition of several witnesses depicts Chidsey's vehicle perpendicular to the grass seating area, such that her vehicle was facing the seating area of the concert. Around 7:00 p.m., Chidsey began to back her vehicle out of her parking space. As she backed out of her parking space in a clockwise direction, she pressed the accelerator instead of the brake pedal, causing her car to accelerate backward across the dance floor and through the grass. Tragically, nine people were injured as a result. LoPiccolo, Honek, and Gielas were dancing on the dance floor when they were each struck by Chidsey's car. All three were injured; Gielas later died as a result of her injuries. McDonald was seated in the grass listening to the music when she was struck by Chidsey's car. She died as a result of her injuries as well.

**{¶ 4}** Relevant to the appeal, both Gielas and McDonald sued Chidsey for wrongful death, alleging negligence and negligence per se, and also asserting a survival claim.[2] The cases were consolidated, and in 2018, each filed amended complaints to add the city and Coxcom, L.L.C., d.b.a. Coxcom Communications ("Coxcom") as new party defendants.[3] The amended complaints also asserted wrongful death and survival claims against the city and Coxcom. The amended complaints alleged, in pertinent part, that the city was negligent "and/or exercised

---

[2] Respectively, Cuyahoga C.P. Nos. CV-17-882477 and CV-17-879674.

[3] Coxcom is not a party to this appeal. The city solicited Coxcom as a sponsor for the summer concert series.

malicious purpose, bad faith, and/or wantonness or recklessness in the planning and organization of the August 21, 2016 summer concert event."

{¶ 5} In September 2019, the city filed a motion for summary judgment against appellees, contending that it was (1) entitled to immunity under the recreational user statute — R.C. 1533.181; (2) entitled to statutory immunity afforded to political subdivisions pursuant to R.C. 2744.02; and (3) not negligent because the incident and resulting injuries were not foreseeable such that a duty of care existed.

{¶ 6} The trial court denied the city's motion, finding that genuine issues of material fact exist as to whether (1) the recreational user statute applied, (2) the city was engaged in a proprietary function that removed its entitlement to immunity; and (3) the events were foreseeable.

{¶ 7} The city appeals, raising the following three assignments of error.[4]

I. The journal entry of the trial court is not sufficiently detailed for [the appellate] court to conduct an appellate review.

II. The trial court erred in denying that portion of [the city's] motion for summary judgment predicated upon recreational immunity under R.C. 1533.181(A)(1) and R.C. [1533].181(A)(5).

III. The trial court erred in denying that portion of [the city's] motion for summary judgment predicated upon political subdivision immunity under R.C. [Chapter] 2744.

Finding the city's third assignment of error dispositive, it will be addressed first.

---

[4] An order that denies a political subdivision the benefit of an alleged immunity is a final appealable order. R.C. 2744.02(C).

## II. Standard of Review

{¶ 8} Questions of immunity are matters of law, so they are particularly apt for resolution by way of summary judgment. *FirstEnergy Corp. v. Cleveland*, 179 Ohio App.3d 280, 2008-Ohio-5468, 901 N.E.2d 822, ¶ 7 (8th Dist.). We review a trial court's decision on a motion for summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Summary judgment is appropriate when, construing the evidence most strongly in favor of the nonmoving party, (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can only reach a conclusion that is adverse to the nonmoving party. *Zivich v. Mentor Soccer Club*, 82 Ohio St. 3d 367, 369-370, 696 N.E.2d 210 (1998).

{¶ 9} The party moving for summary judgment bears the burden of demonstrating that no material issues of fact exist for trial. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). The moving party has the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the nonmoving party's claims. *Id.* After the moving party has satisfied this initial burden, the nonmoving party has a reciprocal duty to set forth specific facts by the means listed in Civ.R. 56(C) showing that there is a genuine issue of material fact. *Id.*

{¶ 10} In a de novo review, this court affords no deference to the trial court's decision and we independently review the record to determine whether the denial

of summary judgment is appropriate. *Hollins v. Shaffer,* 182 Ohio App.3d 282, 2009-Ohio-2136, 912 N.E.2d 637, ¶ 12 (8th Dist.).

## III. Political Subdivision Immunity Under R.C. Chapter 2744

{¶ 11}  In its third assignment of error, the city argues that it was entitled to absolute immunity because hosting a summer concert series on city-owned property is a governmental function.  Alternatively, the city contends that if this court finds that the city was acting in a proprietary function, appellees have failed to establish an exception to immunity that would allow the city to be held liable.  Finally, the city contends that even if the appellees establish an exception, then immunity is reinstated under R.C. 2744.02(A)(3) or (5).

{¶ 12}  Determining whether a political subdivision is immune from tort liability involves a three-step analysis.  *Elston v. Howland Local Schools*, 113 Ohio St.3d 314, 2007-Ohio-2070, 865 N.E.2d 845, ¶ 10.  First, R.C. 2744.02(A)(1) sets forth the general blanket immunity applicable to political subdivisions.  It provides that a political subdivision is generally not liable in a civil action for injury, death, or loss to person or property incurred while performing governmental or proprietary functions.  To overcome this statutory immunity, a plaintiff must show that one of the five exceptions contained in R.C. 2744.02(B) applies.  These exceptions are:

1. negligent operation of a motor vehicle;

2. negligent conduct of employees while carrying out a proprietary function;

3. a municipality's failure to keep roads and sidewalks free from nuisance;

4. injury or loss that occurs due to physical defects within or on the grounds of buildings used for governmental functions, and is caused by the negligence of the municipality's employees; and

5. any other situation in which liability is expressly imposed by the Revised Code.

{¶ 13} If a plaintiff demonstrates that one of the five enumerated exceptions to political subdivision immunity applies, a political subdivision may then assert one of the defenses set forth in R.C. 2744.03(A) to revive or reinstate its immunity.

{¶ 14} There is no dispute that the city is a political subdivision pursuant to R.C. 2744.01(F). Consequently, the city is generally immune from liability for tort claims unless one of the five exceptions in R.C. 2744.02(B) applies.

{¶ 15} In this case, the city contends that none of the exceptions apply because the claims raised against the city relate to governmental functions — the operation of public grounds or a recreational area during a public concert. Moreover, it contends that even if the city was engaged in a proprietary function, it is still immune from liability because negligence cannot be shown. Appellees contend, however, that hosting a summer concert series on city-owned property is a proprietary function. According to appellees, the city is stripped of immunity under the exception found in R.C. 2744.02(B)(2) — "political subdivisions are liable for injury, death, or loss to person or property caused by the negligent performance of acts of their employees with respect to proprietary functions of the political subdivisions." Accordingly, under the second tier of the analysis, this court must first determine whether the city was acting in a governmental or proprietary function.

**{¶ 16}** R.C. 2744.01(C)(1) sets forth the definition of "governmental function." Under this section, a "governmental function" is defined as either those that are specifically enumerated in (C)(2) or that satisfies one of the following three enumerated independent standards:

(a) A function that is imposed upon the state as an obligation of sovereignty and that is performed by a political subdivision voluntarily or pursuant to legislative requirement;

(b) A function that is for the common good of all citizens of the state;

(c) A function that promotes or preserves the public peace, health, safety, or welfare; that involves activities that are not engaged in or not customarily engaged in by nongovernmental persons; and that is not specified in division (G)(2) as a proprietary function.

R.C. 2744.01(C)(1)-(2). Relevant to the city's arguments, a governmental function includes the regulation of the use of public grounds (R.C. 2744.01(C)(2)(e)), and the operation of any recreational area or facility, including a park (R.C. 2744.01(C)(2)(u)).

**{¶ 17}** A "proprietary function" means a function that is specified in division (G)(2) or one in which both of the following are true:

(a) The function is not one described in division (C)(1)(a) or (b) of this section and is not one specified in division (C)(2);

(b) The function is one that promotes or preserves the public peace, health, safety, or welfare and that involves activities that are customarily engaged in by nongovernmental persons.

R.C. 2744(G)(1)-(2).

**{¶ 18}** "'In the absence of an explicit statutory definition, whether a function is governmental or proprietary must be determined by "defining what it is that the

political subdivision is actually doing when performing the function.""" *Frenz v. Springvale Golf Course & Ballroom*, 8th Dist. Cuyahoga No. 97593, 2012-Ohio-3568, ¶ 13, quoting *Kenko Corp. v. Cincinnati*, 183 Ohio App.3d 583, 2009-Ohio-4189, 917 N.E.2d 888, ¶ 27 (1st Dist.), quoting *Allied Erecting & Dismantling Co. v. Youngstown*, 151 Ohio App.3d 16, 2002-Ohio-5179, 783 N.E.2d 523, ¶ 23 (7th Dist.).

{¶ 19} Several courts have found that a political subdivision is acting in a proprietary function when it holds an event like a concert, festival, fair, or similar event. *See Monteith v. Delta Prods.*, 3d Dist. Crawford Nos. 3-07-35 and 3-07-36, 2008-Ohio-1997 (the city was acting in proprietary function when it held a concert); *Brown v. Lincoln Hts.*, 195 Ohio App.3d 149, 2011-Ohio-3551, 958 N.E.2d 1280 (1st Dist.) (the village was acting in a proprietary function when putting on a community festival); *Greene Cty. Agricultural Soc. v. Liming,* 89 Ohio St.3d 551, 559, 733 N.E.2d 1141 (2000) (putting on a hog show is a proprietary function).

{¶ 20} In *Ryll v. Columbus Fireworks Display Co.,* 95 Ohio St.3d 467, 2002-Ohio-2584, 769 N.E.2d 372*,* the Supreme Court analyzed the definition of governmental function to determine whether hosting a fireworks display was governmental or proprietary in nature. The court found that R.C. 2744.01(C)(1)(a)-(c) did not apply because the state did not require the city to hold fireworks, the fireworks display benefited only some but not all of the citizens of the state, and sponsoring a fireworks display is an activity normally engaged in by nongovernmental persons. Based on those findings, the court found that sponsoring a fireworks display was a proprietary function. *Id.* at ¶ 24.

{¶ 21} The same reasoning applies to the summer concert series in this case. While the city was utilizing public grounds in arguably a park area, it was actually hosting a summer concert when the injury occurred. *See Liming* (hosting a fair is a governmental function, but conducting and subsequently investigating the propriety of the hog show is a proprietary function). Examining the "proprietary function" criteria of R.C. 2744.01(G) against the facts of this case, we find that the city is not required to sponsor or host the summer concert series. Additionally, the act of hosting the event was designed to benefit some but not all citizens of the state — it was performed for the benefit the citizens of the city and its neighbors. Finally, although sponsoring a concert promotes public peace, health, safety, or welfare, it is something typically done by nongovernmental persons or entities — private organizations customarily sponsor and host concerts. Accordingly, the city acted in a proprietary function by hosting a summer concert on city-owned property.

{¶ 22} This determination, however, does not end the analysis. Before R.C. 2744.02(B)(2) will remove the city's immunity, the appellees "'must establish * * * the elements required to sustain a negligence action — duty, breach, proximate cause, and damages, [as well as showing] that the negligence arose out of a "proprietary function."'" *Frenz* at ¶ 16, quoting *Parker v. Distel Constr., Inc.*, 4th Dist. Jackson No. 10CA18, 2011-Ohio-4727, ¶ 13. "The duty a defendant owes to the plaintiffs depends upon (1) the relationship between the parties, and (2) the foreseeability of injury." *Id.,* citing *Thayer v. B.L. Bldg. & Remodeling, L.L.C.,* 8th

Dist. Cuyahoga No. 105950, 2018-Ohio-1197, ¶ 24, citing *Simmers v. Bentley Constr. Co.,* 64 Ohio St.3d 642, 597 N.E.2d 504 (1992).

{¶ **23**} Individuals who come onto another's land are traditionally classified into one of three categories: invitee, licensee, or trespasser. *Gladon v. Greater Cleveland Regional Transit Auth.*, 75 Ohio St.3d 312, 315, 662 N.E.2d 287 (1996). The category determines the scope of the legal duty a landowner owes to the entrant. *Sharpley v. Bole*, 8th Dist. Cuyahoga No. 83436, 2004-Ohio-5729, ¶ 13; citing *Gladon* at *id.*

{¶ **24**} The city contends that appellees were licensees; appellees contend that they were invitees. An invitee is one who enters the property or premises of another by express or implied invitation for some purpose that is beneficial to the owner. *Light v. Ohio Univ.*, 28 Ohio St.3d 66, 68, 502 N.E.2d 611 (1986). A licensee is "a person who enters the premises of another by permission or acquiescence for his own pleasure or benefit, and not by invitation." *Turner v. Cathedral Ministries,* 2015-Ohio-633, 27 N.E.3d 586, ¶ 13 (6th Dist.) citing *Light*, at *id.* Typically, visitors on state or local government property are generally classified as licensees. *Souther v. Preble Cty. Dist. Library*, 12th Dist. Preble No. CA2005-04-006, 2006-Ohio-1893, ¶ 15, citing *Provencher v. Ohio DOT*, 49 Ohio St.3d 265, 267, 551 N.E.2d 1257 (1990) (rejecting the concept of "public invitee" in deciding that persons utilizing a state highway rest stop are licensees because no economic benefit is conferred to the owner, i.e. the state of Ohio); *Anthony v. Cleveland State Univ.*, Ct. of Cl. No. 2012-01741-AD, 2012-Ohio-3244 (attendee of free public concert was a licensee).

{¶ 25} In this case, the city promoted the event to the public to attend the city's summer concert series, and appellees have offered no evidence that the city obtained any economic or tangible benefit from the attendees. Although the city may have received a donation for the event from Cox Communications, the focus on the duty owed is the relationship between the injured party and the property owner. And it is undisputed that appellees chose to attend the concert for their own pleasure or benefit. Accordingly, appellees would not be invitees under Ohio law, but rather licensees.

{¶ 26} A landowner owes no duty to a licensee except to refrain from willful, wanton, or reckless conduct that is likely to injure him. *Gladon*, 75 Ohio St.3d at 317, 662 N.E.2d 287, citing *Soles v. Ohio Edison Co.*, 144 Ohio St. 373, 59 N.E.2d 138 (1945), paragraph one of the syllabus. Licensors are "not liable for ordinary negligence." *Light* at 68; *Anthony* at ¶ 8. Additionally, "a licensee takes his license subject to its attendant perils and risks." *Hannan v. Ehrlich*, 102 Ohio St. 176, 131 N.E. 504 (1921), paragraph four of the syllabus. However, a "licensee should not be exposed to hidden dangers, pitfalls or obstructions." *Id.*

{¶ 27} In this case, appellees do not contend that the city failed to warn them of any hidden dangers. The placement of the concert seating area and the dance floor were open and obvious to all attendees.[5] Rather, appellees alleged in their

---

[5] Deposition testimony from LoPiccolo revealed that when she attended this concert and prior concerts held at Greenbriar Commons, she danced on the dance floor, despite being aware that it was in a parking lot, and aware that cars were parked close to the dance floor.

amended complaints that the city was "negligent and/or exercised malicious purpose, bad faith, and/or wantonness or recklessness in the planning or organization of the August 21, 2016 summer concert event, including, but not limited to, the design, layout, placement, installation, and implementation of the [dance floor and seating area] provided for the use of attendees at the event." *See* Gielas Amended Complaint, paragraph 14; McDonald Amended Complaint, paragraph 16.[6] The conduct specifically complained of included (1) placing the dance floor and concert seating area in an operational emergency services parking lot and in an area of motor vehicle traffic; and (2) failing to place proper barriers, traffic control devices, and other protective devices between the parking lot, and the dancing and seating areas. *Id.* According to appellees, it was foreseeable that the city's conduct placed concert attendees at risk of being struck by motor vehicles. *Id.*

{¶ 28} The city contends in its motion for summary judgment that no evidence exists demonstrating that it acted maliciously, in bad faith, wantonly, or recklessly in its placement of the concert seating area in the grass next to the gazebo, or the dance floor in the corner of the parking lot adjacent to the seating area. The city further contends that it did not breach its duty of care by placing portable sawhorses as a protective barrier around the dance floor because the injury complained of was unforeseeable. In support, the city provided deposition

---

[6] Gielas's and McDonald's amended complaints are nearly identical, except that McDonald includes the concert seating area as an area that the city allegedly failed to protect and secure. Unlike Gielas, who was dancing on the dance floor when the injury occurred, McDonald was seated in the grass adjacent to the dance floor.

testimony from Thomas Moran ("Moran"), then-recreation director of the city, and Vaughn McTaggart ("McTaggart"), a 2016 summer employee for the city. Both testified that someone driving onto the dance floor and into the seating area was unforeseeable based on their prior experiences with the city's summer concert series.

{¶ 29} Appellees contend, however, that Moran's and McTaggart's deposition testimonies present a question of fact whether the city's decision to place the dance floor in the parking lot adjacent to the grassy area without any additional protective barriers was wanton or reckless conduct.[7] Additionally, appellees maintain that its experts' reports demonstrate that the decisions made by Moran and the city — including its decision to even host the concert without consulting proper authorities on safety and security — were reckless, and that the injury was entirely foreseeable considering that the concert attracted senior citizens, the dance floor was placed in an active parking lot, and insufficient protective barriers were used to separate the dancing and seating area from the parking lot.

{¶ 30} In *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, the Ohio Supreme Court clarified that the terms wanton and reckless are not interchangeable. *Id.* at paragraph one of the syllabus. The court explained:

> Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result. *Hawkins*, 50 Ohio St.2d at 117-118, 363 N.E.2d 367; *see also* Black's Law Dictionary 1613-1614 (8th

[7] In their respective opposition motions for summary judgment, the appellees did not allege that the city's conduct was willful.

Ed.2004) (explaining that one acting in a wanton manner is aware of the risk of the conduct but is not trying to avoid it and is indifferent to whether harm results).

Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct. *Thompson*, 53 Ohio St.3d at 104-105, 559 N.E.2d 705, adopting 2 Restatement of the Law 2d, Torts, Section 500 at 587 (1965); *see also* Black's Law Dictionary 1298-1299 (8th Ed.2004) (explaining that reckless conduct is characterized by a substantial and unjustifiable risk of harm to others and a conscious disregard of or indifference to the risk, but the actor does not desire harm).

*Id.* at ¶ 33-34.

{¶ 31} Recklessness necessarily requires something more than mere negligence. *Fabrey v. McDonald Village Police Dept.*, 70 Ohio St.3d 351, 356, 639 N.E.2d 31 (1994). In fact, "the actor must be conscious that his conduct will in all probability result in injury." *Id.* "Although the determination of recklessness is typically within the province of the jury, the standard for showing recklessness is high, so summary judgment can be appropriate in those instances where the individual's conduct does not demonstrate a disposition to perversity." *Id.*

{¶ 32} In this case, no evidence was presented to create a genuine issue of material fact that the city's conduct was substantially greater than negligent conduct — there was no evidence that Moran or anyone else employed by the city failed to exercise any care whatsoever (wanton misconduct), or consciously disregarded a known or obvious risk such that it knew or should have known there was a greater probability of substantial harm to anyone due to their actions or inactions (reckless conduct).

{¶ 33} It is undisputed that the concert occurred during the early evening on a Sunday. Moran testified at deposition that the parking area where the dance floor was positioned and the concert seating bordered, was primarily used for concert attendees, and not for any emergency service vehicles. In fact, the police station and other city service buildings were located across the parking lot — on the opposite side from where the concert took place.

{¶ 34} Moran testified at deposition that he purchased a portable dance floor specifically for the summer concert series. He stated that he and his staff constructed and positioned the dance floor in the exact same spot for every concert. Moran testified that on a prior occasion, he attempted to place the portable dance floor in the grass by the gazebo, but discovered that the ground was uneven, which caused the dance floor to be "structurally [un]sound." (Moran Deposition, tr. 136-140, 158.) Therefore, he made the decision to construct the dance floor in the front corner of the parking lot directly next to the concert seating area where the area was level and sturdier.

{¶ 35} Exhibit No. 5 from Moran's deposition depicted that two sides of the dance floor were not directly exposed to the parking lot — one side abutted the concert seating area, the other bordered an area with fixed trash receptacles and a large rock in the grass. The other two sides were cordoned from the parking lot with removable wooden sawhorses — one side was parallel with the marked parking spaces; the other next to a single-lane driving lane. Moran testified that he had no concerns that cars would be driving in the single driving lane because the driving

lane was blocked with his vehicle and the band's vehicles near the exit, thus preventing cars from utilizing that exit of the lot. He testified that he used wooden sawhorses to cordon off the dance floor; the only other alternatives available to the city were hollowed orange barrels or cones.

{¶ 36} Moran admitted that the wooden sawhorses were movable and would not have stopped a vehicle from entering the dance area. He testified, however, that they would have alerted drivers that the area was cordoned off from vehicle traffic. Moran stated that the thought of a vehicle entering the dance area never entered his mind; thus he stated that the purpose of the sawhorses was to prohibit or divert pedestrian traffic away from the dance floor.

{¶ 37} McTaggart testified at deposition that he worked during the concert and remembered Chidsey's parked car that day. He identified photographs, marked as exhibit Nos. 1 and 2, that Moran took moments before the accident. The photographs showed Gielas on the dance floor and Chidsey seated in her car. McTaggart testified from the picture and his recollection, that Chidsey's car was parked directly next to the placed sawhorses, which was the first parking spot next to the dance floor. He stated that he did not know if anyone told Chidsey to park in that spot, but he did not tell Chidsey to move her car and believed that she did not exit her vehicle. According to McTaggart, he believed the presence of the sawhorses indicated that the area was barricaded from vehicle traffic, but admitted that the sawhorses would not hold the force of a car.

{¶ 38} Appellees contend that Moran's deposition testimony creates a genuine issue of material fact regarding whether he should have known that a greater risk of substantial harm was possible because he knew the concert attracted a senior crowd, and that he had a general awareness of the risk of elderly drivers and of news media stories of errant drivers in parking lots or other venues. Additionally, appellees contend that Moran should have known the risks of not providing sufficient barriers around the dance floor and seating area because Moran testified that he would have concerns if cars were travelling down the single lane driveway next to the dance floor when employees were setting up the dance floor and during the concert. However, Moran stated immediately prior that through traffic was not an actual concern during the concert because his vehicle and the band's vehicles blocked the single-lane exit, thus diverting traffic away from travelling next to the dance floor.

{¶ 39} The deposition testimony identified by appellees does not create a genuine issue of material fact that Moran or anyone else from the city (1) failed to exercise any care or (2) consciously disregarded a known or obvious risk, or that Moran should have known that there was a greater likelihood of substantial harm to the concert attendees by failing to provide additional barriers around the dance floor and concert seating area. At best, the evidence demonstrates that the city and Moran acted negligently. Accordingly, the appellees have failed to withstand their reciprocal burden of presenting Civ.R. 56 evidence creating a genuine issue of

material fact that the city breached its duty of care by acting wantonly or recklessly such that an exception to general immunity applies.

{¶ 40} Moreover, no genuine issue of material fact exists establishing that Chidsey's conduct or appellees' injury and death were foreseeable. "An act is foreseeable if a reasonably prudent person, under the same or similar circumstance, would have anticipated the injury to the plaintiff as a result of his actions." *Sanders v. Anthony Allega Contrs.*, 8th Dist. Cuyahoga No. 74953, 1999 Ohio App. LEXIS 6359, 12 (Dec. 30, 1999), citing *Commerce & Industry Ins., Co. v. Toledo*, 45 Ohio St.3d 96, 98, 543 N.E.2d 1188 (1989); *Jeffers v. Olexo*, 43 Ohio St.3d 140, 539 N.E.2d 614 (1989), syllabus. The foreseeability of harm usually depends on the defendant's knowledge — a person cannot guard against risks he does not know about. *Menifee v. Ohio Welding Prods., Inc.*, 15 Ohio St.3d 75, 77, 472 N.E.2d 707 (1984). In determining whether an injury was foreseeable, a court may consider "only those circumstances which [the defendant] perceived, or should have perceived," at the time of the alleged negligent act. *Id.* "Until specific conduct involving an unreasonable risk is made manifest by the evidence presented, there is no issue to submit to the jury." *Id.*

{¶ 41} In support of their argument that a vehicle driving through the dance floor and concert seating area was entirely foreseeable based on the attendees of the concert and the character of the dance floor, appellees cite *Lemley v. Strittmatter*, 9th Dist. Summit No. 12510, 1987 Ohio App. LEXIS 7752 (June 17, 1987). In that case, Lemley, a wedding reception guest who was standing on an outside patio, was

struck by a vehicle driven by an intoxicated wedding guest. The evidence showed that the driver intentionally drove his car toward a guest in the parking lot, and then drove his car directly toward the open end of the patio — striking one guest outside of the protective fence — and then proceeded to drive through the fence, striking Lemley. He sued the owners of the venue, alleging that they failed to provide reasonably safe business premises and failed to protect him from foreseeable dangers, such as vehicles crashing into the patio.

{¶ 42} The owners contended that the act of the driver intentionally driving through the fence and onto the patio was unforeseeable as a matter of law. Lemley contended that his injury was entirely within the realm of foreseeable risks considering the proximity of the parking lot to the patio, the fact that the facility served alcohol, and an inadequate barrier separating the patio from the parking lot. The *Lemley* Court upheld the denial of a directed verdict in favor of the owners, holding that in light of the character of the business, the fact that alcohol would be served, the proximity of the parking lot to the patio, and the inadequate barrier separating the two, reasonable minds could reach different conclusions regarding foreseeability. *Id.* at 15.

{¶ 43} We find that while *Lemley* is instructive, it is factually distinct from the case before this court and thus, distinguishable. The distinguishing factors in *Lemley* are alcohol and the court's analysis of the venue's duty under that owed to an invitee.

**{¶ 44}** First, the venue sold alcohol and indisputably knew that its invitees may consume alcohol. Accordingly, it was entirely foreseeable that impaired guests would drive from the venue. Accordingly, the character of the venue itself created an awareness of potential harm that is not present in the case before this court.

**{¶ 45}** Here, the city hosted a free concert at Greenbriar Commons where attendees could sit in the grassy area around the gazebo and dance on the portable dance floor that was placed in the corner of a parking lot directly adjacent to the seating area. No alcohol was offered by the city for purchase; rather, the city offered complimentary frozen ice cream treats. Accordingly, unlike *Lemley*, where the business owners contributed to the impairment of the third party who caused the injury, the city did not contribute to Chidsey's negligent operation of her vehicle.

**{¶ 46}** Additionally, in *Lemley*, the duty owed was that to an invitee, which is the duty of ordinary care. The court, relying on Comment f. to Section 344 of Restatement of the Law 2d, Torts, also determined "either past experience of the business owner, or the character of the business itself, can make a careless or criminal act of a third party reasonably foreseeable." *Id.* at 12.

**{¶ 47}** In this case, the duty the city owed to appellees was that of a licensee — to refrain from willful, wanton, or reckless conduct that is likely to injure appellees. Even applying the instructive factors relied on in *Lemley*, no evidence was presented that the city contributed to Chidsey's conduct, or that it knew or had reason to know from past experience that errant drivers could endanger the safety of the concert attendees. The testimony was undisputed that neither Moran nor the

city had any relevant past experience, prior incidents, or even complaints of perceived danger. Additionally, the place or character of the venue was a free public concert hosted by the city in a city center complex, which included many facets of a public park.

{¶ 48} The appellees further contend that a genuine issue of material facts exists regarding whether the injury was foreseeable based on the expert reports submitted. Brad Avrit, a safety engineer expert, provided a report regarding the standard safety measures that the city should have implemented in its placement of the dance floor, and the management of both vehicle and pedestrian traffic during the course of the concert. His report was based on his experiences with pedal misapplication errors in parking lots. He opined that based on a reasonable degree of scientific certainty, the city's actions and inactions amounted to wanton and reckless misconduct.

{¶ 49} Additionally, Russell Kolins, a security professional, provided a report on the safety and security measures that the city should have implemented. He concluded that (1) Moran lacked sufficient knowledge and security training to oversee the event; (2) with today's terrorist climate, hosting a community event necessitated communication and planning with safety and security officers, including the U.S. Department of Homeland Security, to host and monitor the event; and (3) the placement of the dance floor and planning of the concert, itself, violated reasonable safety standards. Based on his conclusions, Kolins opined that the city "seriously failed to meet the applicable security standards, laws and regulations,

[and] substantially breached their duty to undertake reasonable care to provide a safe place for patrons and in protecting patrons from a known and foreseeable harm."

{¶ 50} Whether an act is foreseeable is based on whether a reasonably prudent person, under the same or similar circumstance, would have anticipated the injury to the plaintiff as a result of his action or inaction. Accordingly, the experts' opinions regarding what Moran should or should not have done based on their own expertise in their fields does not equate to whether Moran should have foreseen the injury based on his own experiences and knowledge. *See, e.g., Roberts v. Boehl,* 12th Dist. Clermont No. CA2017-08-039, 2018-Ohio-1118 (although qualified as an expert, he has no greater insight into the mind of the defendant regarding whether something was foreseeable).

{¶ 51} Moreover, although Moran testified at deposition that he had a "general awareness" based on the media and acts of terrorism that vehicles could drive into crowds, and that he understood the risk of elderly drivers, this "general awareness," does not create a genuine issue of material fact whether he failed to exercise any care or that he consciously disregarded a known risk that he was placing the attendees of a summer concert in substantial risk of harm of errant drivers by failing to close the parking lot or place additional protective barriers around the dance floor or concert seating area. No evidence was presented that Moran should have been aware of any terroristic threats made toward the city or surrounding areas that would have necessitated him to consult with the U.S. Department of Homeland

Security regarding preventive measures to counteract such threats for the summer concert series, or any other activities under the recreation department's control.

{¶ 52} The evidence presented demonstrates that neither Moran nor any other employee would have anticipated this type of accident or injury at the concert. In fact, both Moran and McTaggart testified at deposition that they never would have anticipated a car would back into or drive onto the dance floor and the concert seating area. *See* Moran deposition p. 66 ("No, it didn't enter my mind."); McTaggart deposition p. 54 ("I would have never guessed that someone would come ramming into [the sawhorses or dance floor].).")

{¶ 53} Finally, although this factor does not automatically negate any duty owed, the city successfully hosted over 15 concerts on this premises without any other similar incidents. And of these concerts, the city constructed its portable dance floor in the exact spot in the parking lot for all of the 2016 concert series, and the two or three years prior. Had there been evidence that similar accidents previously occurred at these concerts or at Greenbriar Commons and the city chose to ignore those incidents and continued acting in accord with its prior practice, then a question of fact may exist whether the city acted wantonly or with reckless disregard of a known risk, or whether the injury was foreseeable.

{¶ 54} Accordingly, even viewing the evidence in favor of appellees, we find that no genuine issue of material fact exists demonstrating that the city breached its duty of care, such that it acted wantonly or recklessly by failing to close the relevant parking area or place additional protective barriers around the dance floor or seating

area.  The evidence demonstrates that while Moran may have acted negligently in failing to cordon off the entire parking area, this inaction did not rise to the level of reckless conduct, and it was unforeseeable that an errant driver would drive through wooden barriers to enter onto the dance floor area and into the seating area on the grass causing serious and fatal injuries to concert attendees.  Because no genuine issue of material fact exists that the city breached its duty of care to appellees, the exception found under R.C. 2744.02(B)(2) does not apply, and the city is immune from liability.

## IV.  Conclusion

**{¶ 55}**  Based on the foregoing, we find that the trial court erred in denying the city's motion for summary judgment as to political subdivision immunity. Finding merit to the city's third assignment of error, its remaining assignments of error are hereby rendered moot.

**{¶ 56}**  Judgment reversed and remanded.

It is ordered that appellant recover from appellees costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

KATHLEEN ANN KEOUGH, PRESIDING JUDGE

EILEEN A. GALLAGHER, J., CONCURS;
EMANUELLA D. GROVES, J., DISSSENTS WITH SEPARATE OPINION

EMANUELLA D. GROVES, J., DISSENTING:

{¶ 57} I respectfully dissent from the majority's opinion. This is not one of those instances where a political subdivision should be covered with the cloak of immunity. This cloak protects political subdivisions when they have properly clothed themselves with the required duty of care and secured the appropriate lens to envision injury to their attendees as a result of their actions or inactions. Where a political subdivision fails to properly clothe and envision, it must be exposed to the liability for the harm it caused. Otherwise, a political subdivision is given full immunity rendering the exceptions meaningless. To ensure enforceability of the exceptions to full immunity, I would have affirmed the trial court's decision in denying the motion for summary judgment.

{¶ 58} After a thorough review of the evidence, I believe genuine issues of material fact remain as to whether Parma Heights acted with recklessness or wanton disregard and whether the sustained harm was foreseeable in this matter.

{¶ 59} Summary judgment should be granted with caution, resolving all doubts in favor of the nonmoving party. _Perez v. Scripps-Howard Broadcasting_

*Co.*, 35 Ohio St.3d 215, 217, 520 N.E.2d 198 (1988). "The purpose of summary judgment is not to try issues of fact but is rather to determine whether triable issues of fact exist." *Lakota Local Schools Dist. Bd. of Edn. v. Brickner* 108 Ohio App.3d 637, 643, 671 N.E.2d 578 (6th Dist. 1996), citing *Fuller v. German Auto Sales, Inc.*, 51 Ohio App.3d 101, 103, 554 N.E.2d 139 (1st Dist. 1988).

**{¶ 60}** There is a genuine dispute whether Parma Heights acted with reckless and/or wanton disregard to the protection of the attendees to the summer concert. Appellees submitted sufficient evidence to warrant a jury's consideration of the issue. Whether or not conduct rises to the level of wanton or reckless behavior is a question to be determined by the jury. *Schoenfield v. Navarre*, 164 Ohio App.3d 571, 2005-Ohio-6407, 843 N.E.2d 234, ¶ 24 (6th Dist.).

**{¶ 61}** The summer concert series was well attended, drawing approximately 150 people, mostly senior citizens. In my view, the decision to hold this event in a public parking lot without exercising due diligence to ensure the safety of the participants is arguably reckless and/or wanton behavior. While the majority points to the testimony of Thomas Moran, and the extent to which it shows a lack of recklessness or wanton disregard, his testimony also calls those same issues into question. Moran testified that the public safety department was tasked with analyzing traffic and pedestrian flow for events and yet Moran did not discuss the planning of the summer concert series with public safety, or any other department. In fact, Parma Heights averred in interrogatories that they did not do any benefit-risk analysis, hazard-risk analysis, or any other analysis to determine, reduce and/or

eliminate foreseeable injuries that could occur during the concerts. Furthermore, Moran testified that he failed to obtain permits for the event or any events as director of recreation. Additionally, he acknowledged that city ordinances included rules for the placement of barricades, the ability to designate streets as "in use" for assemblages, that the summer concert series qualified as an "assemblage," and that public safety had the authority to create play streets and limit traffic in those areas.

{¶ 62} In his deposition testimony, Moran indicated that he was generally aware of the possibility of harm, but he did not foresee the need to incorporate any more precautions than the ones he instituted; i.e., the placement of sawhorses around the dance floor. Moran testified that attendees parked in the same parking lot as where the dance floor was located. As the majority noted, McTaggart, one of Parma Heights summer employees, testified that Chidsey's car was parked next to one of the sawhorses surrounding the dance floor. McTaggart also indicated that he did not advise Chidsey to move her car, nor did anyone advise him to direct traffic or instruct people where to park.

{¶ 63} Regardless of whether Moran's and/or the band's vehicles provided some barriers to traffic, attendees had access to the parking lot and were permitted to park near the dance floor. Besides the sawhorses, there was no other barrier between cars and the concert because there were no curb stops to prevent cars from moving from the parking lot onto the grass.

{¶ 64} As for the issue of foreseeability, a reasonably prudent person could foresee that there was a risk of harm to 150 senior citizen concert attendees where

the concert is in an open parking lot that is not properly secured. Moran acknowledged that Greenbrier Commons housed the public library, the historical society, the police department, fire department, recreation department, and the park itself. The potential for vehicular traffic to any of those venues is obvious. Furthermore, Moran testified that he was aware of the city's procedure for "street parties" which involved the distribution of barricades to block traffic. The existence of the ordinance establishes the city's awareness of the possibility of harm when a party is held on a city street or other right-of-way.

{¶ 65} Given the totality of the circumstances, there were genuine issues of material facts in regard to both wanton or reckless conduct and foreseeability of harm. Therefore, I agree with the trial court's findings that there was a general issue of material fact as to whether Parma Heights was entitled to political subdivision immunity.

{¶ 66} I would further find that Parma Heights' second assignment of error is without merit, and they are not entitled to recreational immunity. Looking at the evidence in a light most favorable to the appellees, the location of the incident was not a premises held open for recreational use. The dance floor was portable and only used in the parking lot during the summer concert series. In his deposition, Moran testified that the parking area was mostly for police personnel, however, it was also for the general public who had business with the police department. Parking spots were not marked or restricted, so members of the public visiting other venues in the Greenbrier Commons parked there as well. In addition to the police department,

the fire department and the recreation department were housed in that area. The only time that portion of the parking lot was used for recreational purposes was during the summer concert series, which consisted of five concerts each summer.

{¶ 67} I would find that because the premises did not qualify under the recreational use statute, neither R.C. 1533.181(A)(1) nor 1533.181(A)(3) apply and would overrule Parma Heights' second assignment of error.

{¶ 68} Accordingly, I would have affirmed the trial court's decision.